UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LESLIE ANN MANNING, also known as
 RONALD MANNING,

                                    Plaintiff,            **DECISION**
                                                          **and**
                    v.                                    **ORDER**

GLENN S. GOORD, Commissioner of New York          **05-CV-850F**
 State Department of Correctional Services,          **(consent)**
M.D. LESTER WRIGHT, Chief Medical Officer/
 Dep. Com. N.Y.S.D.O.C.S., and
M.D. MARY CLEMENS, Facility Medical Director
 of Wende Correctional Facility, Regional Medical
Unit,

                                    Defendants.
_____

APPEARANCES:          PHILLIPS LYTLE LLP
                      Attorneys for Plaintiff
                      WILLIAM P. KEEFER, of Counsel
                      3400 HSBC Center
                      Buffalo, New York 14203

                      ANDREW M. CUOMO
                      Attorney General, State of New York
                      Attorney for Defendants
                      DAVID J. STATE
                      Assistant Attorney General, of Counsel
                      Main Place Towers
                      Suite 300A
                      350 Main Street
                      Buffalo, New York 14202

## JURISDICTION

On July 17, 2006, the parties to this action consented, pursuant to 28 U.S.C. §

636(c)(1), to proceed before the undersigned.  The matter is presently before the court

on Defendants' motion to dismiss (Doc. No. 44), filed July 2, 2009, and on Plaintiff's

cross-motion for partial summary judgment (Doc. No. 48), filed September 21, 2009.

**BACKGROUND**

On December 1, 2005, Plaintiff Leslie Ann Manning, also known as Ronald Manning ("Plaintiff" or "Manning"), then proceeding *pro se*, commenced this civil rights action pursuant to 42 U.S.C. § 1983, while incarcerated at Wende Correctional Facility ("Wende"), in Alden, New York, where Plaintiff was housed in the Regional Medical Unit ("RMU"). Named as Defendants in the original complaint are New York State Department of Correctional Services ("DOCS") Commissioner Glenn S. Goord ("Goord"), DOCS Chief Medial Officer Lester Wright, M.D. ("Dr. Wright"), and Wende RMU Medical Director Mary Clemens, M.D. ("Dr. Clemens"). Plaintiff, a self-designated transsexual who, although anatomically male, identifies with the female gender and considers himself to be a female, alleged Defendants violated Plaintiff's civil rights by denying Plaintiff treatment for Gender Identity Disorder ("GID"), and retaliated against Plaintiff for complaining about the denial of GID treatment by housing Plaintiff in a double-occupancy cell with a male inmate. Defendants's answer was filed on February 2, 2006.

Pursuant to Plaintiff's motion filed February 27, 2006 (Doc. No. 7), the undersigned, on June 6, 2006 (Doc. No. 9), granted Plaintiff's request for appointment of counsel, *pro bono*, assigning Kiseok Moon, Esq. ("Moon"), of Phillips Lytle LLP ("Phillips Lytle") to represent Plaintiff in this matter. On August 24, 2006, Phillips Lytle attorney William P. Keefer, Esq. ("Keefer"), filed a notice of appearance on Plaintiff's behalf (Doc. No. 13), and Moon was terminated as Plaintiff's attorney. By order filed August 31, 2006 (Doc. No. 15), the undersigned appointed Keefer as Plaintiff's

attorney; Keefer has been assisted in the instant proceedings by Erick Bennett, Esq., an associate attorney at Phillips Lytle.  The court expresses its appreciation to Mr. Keefer and Ms. Bennett for their able representation on this complex matter.

On December 1, 2006, Plaintiff, represented by Keefer, filed the amended complaint (Doc. No. 21) ("Amended Complaint"), asserting Defendants are liable under 42 U.S.C. § 1983, for deprivation of her[1] rights under the Fifth, Eighth and Fourteenth Amendments by failing to diagnose and treat Plaintiff for GID, and retaliated against Plaintiff for commencing this action by transferring Plaintiff from a single cell to a double occupancy cell with a male cellmate.   Defendants' answer to the Amended Complaint was filed on March 20, 2007 (Doc. No. 22).

On July 2, 2009, Defendants filed a motion to dismiss the Amended Complaint (Doc. No. 44) ("Defendants' Motion"), attached to which is the Memorandum of Law in Support of Defendants' Motion to Dismiss (Doc. No. 44-2) ("Defendants' Memorandum").  In opposition to Defendants' Motion, Plaintiff filed on September 21, 2009, the cross-motion for partial summary judgment (Doc. No. 48) ("Plaintiff's Motion"), attached to which are the Declaration of Leslie Ann Manning (Doc. No. 48-2) ("Plaintiff's Declaration"), the Affidavit of William P. Keefer, Esq. (Doc. No. 48-3) ("Keefer Affidavit"), exhibits A through J (Docs. Nos. 48-4 through 48-13) ("Plaintiff's Exh(s). __"), a Statement of Undisputed Facts (Doc. No. 48-14) ("Plaintiff's Undisputed Facts Statement"), and a Memorandum of Law in Opposition to Defendants' Motion to

---

[1] Although Plaintiff remains anatomically male, the court uses female pronouns when referring to Plaintiff for consistency with the papers filed by the parties, who use female pronouns when referring to Plaintiff because Plaintiff considers herself a female.

Dismiss and in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. No. 48-15) ("Plaintiff's Memorandum").

On November 17, 2009, Defendants filed the Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment and in Further Support of Defendants' Motion to Dismiss (Doc. No. 52) ("Defendants' Response"), a Counter Statement of Facts in Response to Plaintiff's Statement of Undisputed Facts (Doc. No. 53) ("Defendants' Facts Statement"); the Declarations of Assistant Attorney General David J. State (Doc. No. 54) ("State Declaration"), with attached exhibits A and B ("Defendants' Exh(s). __"), DOCS Superintendent Goord (Doc. No. 55) ("Goord Declaration"), Dr. Clemens (Doc. No. 56) ("Dr. Clemens Declaration"), and Dr. Wright (Doc. No. 56) ("Dr. Wright Declaration"). On December 16, 2009, Plaintiff filed in further support of Plaintiff's Motion the Reply Affidavit of William P. Keefer, Esq. (Doc. No. 58) ("Keefer Reply Affidavit"), with attached exhibit A (Doc. No. 58-2) ("Plaintiff's Reply Exh. A"), and the Reply Memorandum of Law in Further Support of Plaintiff's Motion for Partial Summary Judgment (Doc. No. 58-3) ("Plaintiff's Reply Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion to dismiss is DENIED; Plaintiff's Motion is DENIED; summary judgment is GRANTED in favor of Defendants.

## FACTS[2]

At all times relevant to this action, Plaintiff Leslie Ann Manning, also known as

---

[2] Taken from the pleadings and motion papers filed in this action.

Ronald Manning ("Plaintiff" or "Manning"), was housed at Wende Correctional Facility ("Wende"), in Alden, New York, Defendant Lester Wright, M.D. ("Dr. Wright"), was DOCS Chief Medical Officer, and Defendant Mary Clemens, M.D. ("Dr. Clemens"), was Director of Wende's Regional Medical Unit ("RMU"). Wende's RMU "is essentially a nursing home for chronically ill inmates." Dr. Clemens Declaration ¶ 2. Plaintiff has been housed in Wende's RMU for health problems related to his HIV-positive status,[3] with a poor prognosis.

Plaintiff maintains that although born a male, since age seven, she "has had a strong psychological urge to live and dress as a female," and claims to have been diagnosed, at an unspecified age, with Gender Identity Disorder ("GID"), or Transsexualism. Amended Complaint ¶¶ 9-10. According to Plaintiff, GID causes her "to identify with the female gender rather than the male gender," resulting in Plaintiff experiencing anguish and depression. *Id.* ¶¶ 11-12. Although the record contains no evidence establishing Plaintiff had been medically identified with GID prior to her current incarceration, Plaintiff claims that throughout her incarceration, and prior to 2003, she made numerous requests to receive hormone therapy to treat her GID, but her requests were always denied. Plaintiff's Declaration ¶ 5.

Plaintiff alleges that at some unidentified time during Plaintiff's current incarceration at Wende, she took estrogen pills[4] provided to her from another,

---

[3] Because the record refers to Plaintiff as being both HIV-positive, *see, e.g.*, Dr. Clemens Declaration ¶ 8 (referring to Plaintiff's "HIV condition"), as well as having AIDS, *see, e.g.*, Deposition Testimony of Angel A. Gutierrez, M.D., attached as Exhibit A to State Declaration, at 28, 35 (referring to Plaintiff as having AIDS), it is not clear whether Plaintiff has, in fact, developed AIDS.

[4] With regard to Plaintiff's assertion, Amended Complaint ¶ 13, that "[h]ormone therapy is a generally accepted and appropriate medical therapy for GID," Defendants "admit that hormone therapy is

unidentified, inmate, but had been unable to take any estrogen since the inmate was transferred to another correctional facility, causing Plaintiff to become depressed. Amended Complaint ¶¶ 17-18.  Plaintiff further alleges "Defendants' refusal to provide Plaintiff appropriate medical care for Plaintiff's medical condition has resulted in Plaintiff experiencing extreme emotional anguish and depression which has manifested itself in attempts to self mutilate and commit suicide."  Amended Complaint ¶ 22.

A policy statement issued by DOS DHS on February 23, 1993, provides DOCS "continues treating inmates for Gender Dysphoria[5] identified prior to incarceration." DOCS Health Care Policy 1.31 ("DOCS GID Policy"), Plaintiffs' Exh. H.  In particular, before estrogen therapy would be provided to an inmate with GID, "[d]ocumentation of prior hormonal therapy must be obtained from the inmate's prior provider."  *Id*.  Further, transsexual surgical operations would not be allowed during an inmate's period of incarceration. *Id*.

Plaintiff was initially treated in Wende's RMU by Angel A. Gutierrez, M.D. ("Dr. Gutierrez"), until 2002 when Dr. Gutierrez became the RMU's medical director, and Dr. Clemens became Plaintiff's treating physician in the RMU.  While under Dr. Gutierrez's care, Plaintiff requested hormone therapy for GID, which Dr. Gutierrez refused because of Dr. Gutierrez's perception was that Plaintiff, "as a patient was someone who was not here long," *i.e.*, expected to live long, based on Plaintiff's AIDS diagnosis, that Plaintiff was "already having tremendous difficulty dealing with the HIV medication," and that

---

an accepted therapy in some cases of GID, [but] deny . . . that it is appropriate or is the only appropriate therapy regarding plaintiff."  Answer ¶ 3.

[5] GID was previously referred to as "gender dysphoria."

Plaintiff, who had yet to be diagnosed with GID and who was not already receiving hormone therapy, did not meet DOCS GID Policy requirements. Dr. Gutierrez Deposition T.[6] at 34-37. Dr. Gutierrez explained that the decision to deny Plaintiff's request for hormone therapy was based on Dr. Gutierrez's professional opinion that it was against Plaintiff's best interest to give Plaintiff a "high dose hormone treatment" in light of Plaintiff's HIV-positive status, combined with the fact that because Plaintiff did not enter DOCS system already under treatment for GID, the DOCS GID Policy prohibited Dr. Gutierrez from starting Plaintiff on the hormone therapy at that time. *Id*. at 41.

On April 22, 2003, Plaintiff filed Inmate Grievance Complaint No. 19153-03 ("First Grievance"),[7] challenging Dr. Gutierrez's denial, in 2002, of hormone therapy to treat her GID. First Grievance at 1. On May 7, 2003, the Inmate Grievance Review Committee ("IGRC"), denied the First Grievance because Plaintiff did not "meet the criteria for the requested hormonal therapy" under the DOCS GID Policy. First Grievance at 2.

On July 24, 2003, Dr. Wright, in connection with an unrelated legal action involving another inmate seeking treatment for GID, stated in a declaration that DOCS GID Policy should not be interpreted so as to deny evaluation or treatment for an inmate who first manifests GID while incarcerated. July 24, 2003 Declaration of Lester Wright, M.D. ("2003 Dr. Wright Declaration"), ¶ 7 (Plaintiff's Exh. G). Dr. Wright further

---

[6] References to "Dr. Gutierrez Deposition T." are to the page of the transcript of the October 12, 2007 deposition of Dr. Gutierrez, a copy of which is attached as Exhibit A to the State Declaration.

[7] Although not denominated as an exhibit, a copy of Plaintiff's First Grievance is attached to the Amended Complaint.

stated in that action that upon an inmate's first manifestation of GID, "a referral should be made to the appropriate clinician with OMH [New York State Office of Mental Health] for evaluation." 2003 Dr. Wright Declaration ¶ 8 (bracketed material added).

On October 20, 2003, Plaintiff filed Inmate Grievance Complaint No. 20159-03 ("Second Grievance"),[8] again challenging the denial of her requests for hormone therapy treatment for her GID. Second Grievance at 2. On November 5, 2003, the IGRC denied the Second Grievance because Plaintiff did not "meet the criteria for the to receive hormonal therapy." Second Grievance at 2. An appeal of the denial of the Second Grievance to DOCS Central Office Review Committee ("CORC") was denied on December 23, 2003.

In 2004, Plaintiff commenced an Article 78 proceeding[9] in New York Supreme Court, Erie County, challenging the December 23, 2003 CORC determination denying Plaintiff hormone therapy based on Plaintiff's failure to follow DOCS GID Policy's requirement that before DOCS would provide Plaintiff with hormone therapy to treat GID, Plaintiff must provide documentation establishing prior hormone therapy. Among the respondents named in the Article 78 Petition were Defendants Goord and Dr. Wright. On August 5, 2004, the state court dismissed Plaintiff's Article 78 petition because Plaintiff had failed to show DOCS GID Policy was arbitration, capricious and without rational basis. August 5, 2004 Memorandum, Decision and Order.[10]

---

[8] Also not denominated as an exhibit, a copy of Plaintiff's Second Grievance is attached to the Amended Complaint.

[9] An Article 78 proceeding is a court proceeding for challenging the actions of an administrative agency. New York Civil Procedure § 7801 (McKinney's 2008).

[10] Amended Complaint, Exh. A.

The first medical evidence in the record regarding Plaintiff's assertion to Dr. Clemens that Plaintiff wanted to receive medical treatment for her GID is dated October 21, 2003. *See* Plaintiff's DOCS Division of Health Services ("DHS") Progress Notes ("Plaintiff's Progress Notes"), Plaintiff's Exh. I at 7. At that time, Plaintiff explained that she was not then receiving any hormone therapy, but claimed, without documentation, to have received Premarin (an estrogen replacement drug) for seven months during a previous incarceration in Alabama, prior to coming to New York. *Id*. at 8. Plaintiff's Progress Notes for October 21, 2003, states that had Plaintiff began receiving hormone therapy prior to incarceration, the treatment would have been continued, but otherwise such treatment would not be started while Plaintiff was incarcerated. *Id*.

On August 10, 2005, Plaintiff sent to Dr. Clemens a written request for hormone therapy, advising that Plaintiff "ha[d] alreadt [*sic*] been Diagnosed [*sic*] with TRANSSEXUALISM OR GENDER IDENTITY DISORDER." August 10, 2005 Letter[11] (capitalization in original). In a Memorandum dated August 18, 2005 ("August 18, 2005 Memorandum"[12]), Dr. Clemens, quoting from the DOCS GID Policy, informed Plaintiff that because the policy "indicates that DOCS 'will maintain hormone therapy for inmates having a gender identity disorder that is identified and treated prior to incarceration,'" when Plaintiff provided documentation of her prior hormonal therapy, psychiatric consultations, in necessary, would be arranged "'to review the continued

---

[11] Amended Complaint, Exh. C, p.1.

[12] Amended Complaint, Exh. C, p.2.

status of therapy to justify the treatment plan.'" August 18, 2005 Memorandum.[13]  On

August 19, 2005, Plaintiff responded to the August 8, 2005 Memorandum with another

letter to Dr. Clemens, requesting evaluation and treatment for GID, and advising that in

the 2003 Dr. Wright Declaration, Dr. Wright stated that, contrary to Dr. Clemens's

interpretation of DOCS GID Policy, inmates without a previous GID diagnosis, or history

of hormone therapy, should not be denied evaluation or hormone therapy.  August 19,

2005 Letter.[14]  The record does not indicate Plaintiff ever provided documentation of her

alleged prior GID hormonal treatment in Alabama.

Plaintiff was first diagnosed with GID on December 4, 2008, by Thomas A.

Mazur, Psy. D. ("Dr. Mazur"), who evaluated Plaintiff at the request of DOCS.  Dr.

Mazur Psychological Report, Plaintiff's Exh. F.


## DISCUSSION

Defendants move to dismiss the Amended Complaint, asserting Defendants are

qualifiedly immune from liability because Plaintiff's alleged right not to be subjected to

the conduct of which Plaintiff complains was not clearly established at the relevant time

of such conduct, *i.e.*, the denial of an evaluation and treatment for Plaintiff's GID.

Defendants' Memorandum at 2.  In opposition to Defendants' Motion, Plaintiff argues

that Defendants are not entitled to qualified immunity in this action because

Defendants' repeated refusal to provide Plaintiff with an evaluation and treatment for

---

[13] The court notes that the language Dr. Clemens quotes is from the DOCS GID Policy after its revision on October 8, 1999.  A copy of the revised DOCS GID Policy is attached as Exhibit B to Dr. Wright Declaration.

[14] Amended Complaint, Exh. C.

GID "began well after the federal courts in the Second Circuit established a clear right to such treatment for prisoners with GID." Plaintiff's Memorandum at 1-2. Plaintiff also cross-moves for partial summary judgment on the issue of whether Plaintiff's Eighth Amendment rights have been violated, and whether Plaintiff has demonstrated a claim for damages under § 1983, such that the only issues remaining are Plaintiff's request for equitable relief and the amount of monetary damages to be awarded.[15] *Id*. at 2.

## 1.    Motion to Dismiss

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 570.

---

[15] According Plaintiff's motion is denominated as seeking partial summary judgment on the issue of liability on her claims for deliberate indifference and retaliation, because summary judgment generally is not granted on the issue of damages, the court construes Plaintiff's motion as seeking summary judgment in the entirety.

Here, Defendants seek dismissal of the Amended Complaint on the basis that Defendants, as state officials, are qualifiedly immune from liability on the alleged claims because Defendants' alleged denial of an evaluation and treatment for Plaintiff's GID did not, at the time of such conduct, violate a clearly established right of Plaintiff. Defendants' Memorandum at 2. In opposition to Defendants' Motion, Plaintiff argues Defendants cannot establish a qualified immunity defense because Defendants' alleged unlawful conduct violated clearly established constitutional rights about which a reasonable person would have known when Plaintiff requested treatment for GID by July 24, 2003, when the 2003 Dr. Wright Declaration was executed. Plaintiff's Memorandum at 15-17. In further support of dismissal, Defendants assert that Plaintiff fails to cite any Supreme Court or Second Circuit ruling establishing that a transsexual inmate has an Eighth Amendment right to medical treatment for GID. Defendants' Response at 2-4.

The Second Circuit recognizes that the affirmative defense of qualified immunity may be asserted in a Rule 12(b)(6) motion to dismiss "'as long as the defense is based on facts appearing on the face of the complaint.'" *Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir. 2008) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). In adjudicating a motion to dismiss based on qualified immunity, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at 436. "A party endeavoring to defeat a lawsuit by a motion to dismiss for failure to state a claim faces a 'higher burden' that a party proceeding on a motion for summary judgment." *Id*. (citing Moore's Federal Practice § 56.30[3][6] and § 56.30[3][d]). Further, when a

defendant raises a qualified immunity defense on a motion to dismiss, instead of in a motion for summary judgment, the defendant "must accept the more stringent standard applicable to this procedural route," with the plaintiff permitted to rely on the allegations of the complaint in opposing dismissal, in contrast to summary judgment which would require the plaintiff to "counter the movant's affidavits [in support of summary judgment] with specific facts showing the existence of genuine issues warranting a trial." *McKenna*, 386 F.3d at 436 (citing cases and Fed. R. Civ. P. 56(c)) (bracketed material added).

Qualified immunity shields law enforcement or prison officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which, as relevant, a reasonable prison official would have known. *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Washington Square Post No. 1212 v. Maduro*, 907 F.2d 1288, 1291 (2d Cir. 1990). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 129 S.Ct. at 815 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 129 S.Ct. at 815 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). It is important to resolve immunity questions at the earliest possible stage of litigation to preserve the purpose of qualified immunity, *i.e.*, ensuring that insubstantial claims against government officials are resolved prior to discovery. *Id*. (citing cases). *See Saucier v.*

*Katz*, 533 U.S.194, 200 (2001) ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." (internal quotation omitted)).

Resolution of a government official's qualified immunity claim involves a two-prong analysis, including (1) whether the plaintiff has alleged a deprivation of a constitutional right; and (2) whether such right was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 129 S.Ct. at 815-16; *Saucier*, 533 U.S. at 201; *Pena v. DePrisco*, 432 F.3d 98, 107 (2d Cir. 2005). The district court must consider both "Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right." *Okin v. Village of Cornwall-on-Hudson Police Dept.*, 577 F.3d 415, 433 (2d Cir. 2009). Although both prongs must be established, it is within the court's discretion which prong should be addressed first in light of the circumstances of the case at hand. *Pearson*, 129 S.Ct. at 818. In the instant case, the court finds the Amended Complaint sufficiently alleges a deprivation of a constitutional right that was clearly established at the time of Defendants' alleged violations, such that the Amended Complaint cannot be dismissed at the pleading stage based on qualified immunity.

In particular, Plaintiff alleges Defendants violated her civil rights under 42 U.S.C. § 1983, pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Plaintiff's specific constitutional right infringed by Defendants' alleged denial of medical treatment for her GID is brought pursuant to the Eighth Amendment's prohibition against deliberate indifference to Plaintiff's medical need for GID therapy

14

and treatment, made applicable to the states by the Fourteenth Amendment's Due Process Clause.[16]  In 2000, the Second Circuit, viewing all facts in the light most favorable to the plaintiff as required on an appeal from a grant of summary judgment, "assumed" that GID constitutes a serious medical condition.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (assuming for the purposes of appeal, and viewing the facts in the light most favorable to the plaintiff, "that transsexualism constitutes a serious medical need.").  Because the district court, on a motion to dismiss, is similarly required to accept as true the plaintiff's factual allegations and to construe those allegations in the light most favorable to the plaintiff, *Goldstein*, 516 F.3d at 56, as well as "those that defeat the immunity defense," *McKenna*, 386 F.3d at 432, the court assumes, for the purposes of Defendants' motion, consistent with *Cuoco*, that Plaintiffs' GID constitutes a serious medical condition sufficient to avoid dismissal of the Amended Complaint for failure to state a claim.  Furthermore, insofar as Defendants' alleged unlawful conduct, *i.e*, the refusal to evaluate and treat Plaintiff's GID, occurred beginning in 2003, Amended Complaint ¶ 19, such conduct occurred after *Cuoco* was decided in 2000.

Although Defendants reference *Cuoco*, *supra*, in support of Defendants' qualified

---

[16] Although Plaintiff also references both the Fifth and Fourteenth Amendments as the source of her denial of due process claim, Amended Complaint ¶¶ 5, 41, and 43, Eighth Amendment claims for deliberate indifference and failure to treat are properly asserted by an inmate incarcerated in state custody under the Due Process Clause of the Fourteenth Amendment, rather than the Fifth Amendment, which applies to an inmate or pretrial detainee in federal custody.  *See Caiozzo v. Koreman*, 581 F.3d 63, 69 & n. 3 (2d Cir. 2009) (stating claims for indifference to medical needs of a state prisoner or detainee are properly brought under the Fourteenth Amendment's Due Process Clause, as compared to a similar claim brought by a federal prisoner or federal detainee which is properly brought under the Fifth Amendment's Due Process Clause).  Accordingly, Plaintiff's due process claim is analyzed under only the Fourteenth Amendment.

immunity defense, Defendants' Memorandum at 3, asserting that, in *Cuoco*, qualified immunity was granted to the warden of a federal prison, a prison health services administrator, psychiatrist and chief psychologist, who refused to provide hormone therapy to a transsexual inmate housed at an all-male federal prison, the circumstances under which qualified immunity was granted to such defendants in *Cuoco* are factually distinguishable from the instant case.  In particular, the claims in *Cuoco* were not dismissed on qualified immunity grounds based on a failure to state a claim against the prison warden, the prison health services administrator, the psychiatrist and the chief psychologist; rather, the court held, on summary judgment, that the defendants, each of whom had sufficiently interacted with the plaintiff to establish the requisite personal involvement, were qualifiedly immune from liability for failing to treat the plaintiff's GID. *Cuoco*, 222 F.3d at 111.  Specifically, the record failed to establish that either the prison warden or prison health services administrator, neither of whom was a medical doctor, had any authority to intervene in any medical decision by the prison physicians who were actually involved in the plaintiff's health care.  *Id.* Summary judgment based on qualified immunity was granted in favor of the prison staff psychiatrist who had only "two brief meetings" with the plaintiff, but who was not assigned, or authorized as a physician, to treat the plaintiff. *Id*. at 104, 111 (a prison staff psychiatrist's "refusal to intervene in the medical treatment of another doctor's patient simply because the patient demanded it was objectively reasonable as a matter of law.").  Finally, in *Cuoco*, summary judgment based on qualified immunity was granted in favor of the prison's chief psychologist who, "having no medical degree, had no authority to decide what medical treatment was appropriate for [the plaintiff]." *Id*. at 111.  *Cuoco* is thus

inapposite and Defendants' reliance on *Cuoco* is misplaced.

As such, for purposes of Defendants' Rule 12(b)(6) motion, the constitutional right which Plaintiff asserts as the basis for her claim was clearly established at the time of Defendants' alleged unlawful conduct, thus barring Defendants' qualified immunity defense. Defendants' Motion, based on the qualified immunity affirmative defense, is therefore DENIED. The court accordingly turns to Plaintiff's motion for summary judgment.

## 2. Summary Judgment

Summary judgment on a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322.

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor and "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible."

*Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995)

(citing cases). Rather, Fed. R. Civ. P. 56(e) requires that

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

"[F]actual issues created solely by an affidavit crafted to oppose a summary judgment

motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614,

619 (2d Cir.1996). Furthermore, the district court may grant summary judgment in favor

of the nonmovant if the undisputed record, as submitted by a movant in support of

summary judgment, establishes the nonmovant is entitled to summary judgment as a

matter of law. *See New England Health Care Employees Union, Dist. 1199, SEIU AFL-

CIO v. Mount Sinai Hospital*, 65 F.3d 1024, 1030 (2d Cir. 1995) ("Because a motion for

summary judgment searches the record, we may reverse the grant of summary

judgment and order judgment for the non-moving party if we find undisputed support in

the record entitling the non-moving party to judgment as a matter of law." (citation

omitted)); *see also Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d

Cir. 1991) (acknowledging the district court's practice of granting summary judgment in

favor of the nonmovant "has become an accepted method of expediting litigation" (citing

*Celotex Corp.*, 477 U.S. at 326)). In the instant case, although Plaintiff moved for

summary judgment on the issue of Defendants' liability with regard to the deliberate

indifference and retaliation claims, the undisputed facts in the record establish that

summary judgment should be granted in favor of Defendants, notwithstanding their

status as nonmoving parties.

A. **Deliberate Indifference to Serious Medical Need**

In support of summary judgment, Plaintiff maintains that the undisputed facts establish Plaintiff's GID is a serious medical condition in response to which Defendants have acted with deliberate indifference by refusing to either diagnose the condition or provide treatment.  Plaintiff's Memorandum at 7-14.  In opposition to summary judgment, Defendants assert that Plaintiff cannot establish either the objective or subjective element of an Eighth Amendment deliberate indifference to serious medical need claim.  Defendants' Response at 4-12.  In further support of summary judgment, Plaintiff asserts Defendants have failed to establish a triable issue of fact precluding summary judgment on the liability issue as Plaintiff requested.  Plaintiff's Reply at 2-9.

A claim for an Eighth Amendment deliberate indifference to serious medical condition has both objective and subjective elements.  *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005).  To establish the objective element, Plaintiff must show that, at the time of the alleged failure to treat, she had a "serious medical condition."  *Cuoco*, 222 F.3d at 106.  The subjective element requires Plaintiff establish Defendants were "deliberately indifferent" to the serious medical condition.  *Id*.  Here, the record contains no evidence establishing either the first element or the second element; rather, Defendants' evidence, unrebutted by Plaintiff, establishes that assuming, *arguendo*, that Plaintiff's GID constitutes a serious medical condition as required under the first element, Defendants were not deliberately indifferent to such need.

Specifically, in *Cuoco*, *supra*, the Second Circuit assumed, for the purpose of the

appeal before the court, under which circumstances the court was required to drawn all inferences in favor of the plaintiff, that GID constitutes a serious medical condition.[17] *Cuoco*, 222 F.3d 106.  In contrast, in the instant case, Defendants do challenge whether GID constitutes a serious medical condition.  Defendants' Memorandum at 4-5; Defendants' Reply at 3-4.  Furthermore, although in the motion to dismiss, Plaintiff was permitted to rely on the allegations of the Amended Complaint, on summary judgment, Plaintiff must establish, by more than the complaint's allegations, the absence of any disputed issue of fact that GID constitutes a serious medical condition, a "more stringent standard" than that required to defeat a motion to dismiss.  *McKenna*, 386 F.3d at 436 (citing cases and Fed. R. Civ. P. 56(c)).

To establish the objective component of a "serious medical condition," Plaintiff must prove that her GID is "a condition of urgency, one that may produce death, degeneration, or extreme pain."  *Johnson*, 412 F.3d at 403.  Here, Plaintiff has produced no evidence establishing that, without treatment, her GID "may produce death, degeneration, or extreme pain."  *Id*.

In particular, despite repeated assertions that Defendants' failure to treat her GID has rendered Plaintiff emotionally distraught and depressed, causing Plaintiff to become suicidal and to contemplate self-mutilation, *see*, *e.g.*, Amended Complaint ¶ 12 (alleging Plaintiff's "GID causes Plaintiff to experience depression and emotional anguish because Plaintiff's sexual organs do not correspond with Plaintiff's gender

---

[17] The *Cuoco* defendants, rather than disputing whether GID constitutes a serious medical condition, challenged whether the plaintiff was, in fact, a transsexual.  *Cuoco*, 222 F.3d at 106.  In the instant case, Defendants do not dispute Plaintiff is a transsexual, but do dispute that Plaintiff was diagnosed with GID prior to Dr. Mazur's diagnosis on December 4, 2008.  Defendants' Facts Statement ¶ 6.

identity"); and ¶ 22 ("Defendants' refusal to provide Plaintiff with appropriate medical care for Plaintiff's medical condition has resulted in Plaintiff experiencing extreme emotional anguish and depression which has manifested itself in attempts to self mutilate and commit suicide"), the record is devoid of any evidence establishing Plaintiff's mental state had actually deteriorated consistent with these allegations. In fact, according to the December 4, 2008 Dr. Mazur Psychological Report, Plaintiff's Exh. F, in which Plaintiff was first diagnosed with GID, Plaintiff claimed to have contemplated, but never actually attempted, self-mutilation by "slicing his 'male anatomy,'" *i.e.*, sex organs, with a razor. Dr. Mazur Psychological Report at 3. Further, Plaintiff reported to Dr. Mazur that in May 2007, Plaintiff "put a rubber band around his testicles in an effort to remove them," resulting in pain for which Plaintiff sought medical treatment; Plaintiff, however, "did not inform the medical personnel at Wende why or how this happened." *Id*. Dr. Mazur also commented on the lack of any documentation in Plaintiff's medical records corroborating any of Plaintiff's assertions, including allegedly tying her testicles with a rubber band, that Plaintiff has inflicted physical harm on herself as a result of her alleged GID. *Id*. Significantly, Plaintiff does not contradict Dr. Mazur's averments.

Accordingly, Plaintiff has failed to establish the first component of her Eighth Amendment deliberate indifference claim that she suffers from a serious medical condition triggering Defendants' obligation, under the Eighth Amendment, to provide treatment. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (acknowledging that absent a "sufficiently serious" condition that "may produce death, degeneration, or extreme pain," an alleged failure to treat does not arise to an Eighth Amendment

violation (internal quotations omitted)).  Further, although whether GID constitutes a serious medical condition remains a disputed issue of fact, *see Cuoco*, 222 F.3d at 106, thus precluding summary judgment in favor of Plaintiff on the issue of liability, even assuming that GID does constitute such a serious medical condition, the record establishes no undisputed fact upon which a reasonable jury could find that Defendants were deliberately indifferent to such condition, as required for the subjective component of Plaintiff's Eighth Amendment claim.

In particular, with regard to the requisite subjective component of a deliberate indifference claim that Defendants "acted with a sufficiently culpable state of mind,'" *Johnson*, 412 F.3d at 403 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)), for entitlement to summary judgment, Plaintiff must prove that Defendants were both aware of and disregarded "an excessive risk to inmate health or safety. . . ." *Johnson*, 412 F.3d at 403 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  In other words, the subjective component of Plaintiff's claim requires Plaintiff prove that Defendants both were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and also drew such inference.  *Id*.

"Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law," requiring Defendants "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Farmer*, 511 U.S. at 836-40).   To establish such recklessness, "the risk of harm must be substantial and the official's actions more than merely negligent.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37).  The defendant must be subjectively aware that his conduct creates an excessive

risk to the inmate's health or safety. *Id*. Mere disagreement about the proper course of medical treatment is insufficient. *Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner may prefer a different treatment does not give rise to an Eighth Amendment violation.").

Moreover, a jury may infer the absence of a sufficiently culpable state of mind if the jury believes the defendant's denial of the subject medical treatment "' because the defendant [ ] sincerely and honestly believed . . . that applying [a prison policy mandating the denial of treatment] was, in plaintiff's case, medically justifiable.'" *Salahuddin*, 467 F.3d at 281 (quoting *Johnson*, 412 F.3d at 404). In other words, "the defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281. In the instant case, Plaintiff not only fails to submit evidence sufficient to establish the subjective component, but also fails to rebut Defendants' evidence, *see, e.g.*, Dr. Gutierrez Deposition T. at 41 (explaining decision not to provide Plaintiff with hormone therapy based on medical opinion that such treatment was not in Plaintiff's best interest given Plaintiff's HIV-position status); and Dr. Clemens Declaration ¶ 8 (asserting, based on conversations with the infectious disease specialist following Plaintiff's HIV condition, that "hormonal therapy could be detrimental to the management of [Plaintiff's] other [health] problems."), establishing that Defendants did not act with a sufficiently culpable state of mind with regard to Plaintiff's requested treatment.

First, the absence of any evidence in the record that Plaintiff was, prior to her

incarceration at Wende, either diagnosed with GID or provided with hormone therapy for treatment of GID, corroborates Defendants' assertion that Plaintiff was initially denied hormone therapy because she did not meet the DOCS GID Policy's requirements for such therapy. Dr. Clemens Declaration ¶¶ 4, 5, and 9. Without such evidence, Defendants' reliance on the DOCS GID Policy cannot be said to be other than sincere, "even if objectively unreasonable . . . ." *Salahuddin*, 467 F.3d at 281. *See Johnson*, 412 F.3d at 404 (holding that a jury could infer the absence of a sufficiently culpable state a mind if the jury believes the defendant's denial of medical treatment was based on the defendant's sincere and honest belief that application of a prison policy mandating the denial of treatment was medically justified).

Second, although the record establishes that Defendants were made aware, either through Plaintiff's First and Second Inmate Grievances, or Plaintiff's Article 78 proceeding in which both Goord and Dr. Wright were named as defendants, that Plaintiff claimed to be suffering from GID, and desired treatment for the condition, the record fails to establish that any Defendant was aware that by failing either to refer Plaintiff to the proper mental health professional for diagnosis of GID, and to thereafter provide Plaintiff with Plaintiff's requested hormone therapy, Defendants placed Plaintiff at a substantial risk of serious harm. Dr. Mazur's comments regarding Plaintiff's failure to inform anyone on Wende's medical staff about her attempts and thoughts of self-mutilation, Dr. Mazur Psychological Report at 3, further undermine Plaintiff's assertions, without supporting evidence, that Defendants were deliberately indifferent to a serious

medical condition of which Defendants were aware.[18]

Finally, Plaintiff does not dispute Defendants' contentions, supported by the deposition testimony of Dr. Gutierrez, that the decision not to provide Plaintiff with the requested hormone therapy, despite the DOCS GID Policy, was based on Dr. Gutierrez's desire to protect Plaintiff's medical condition, including Plaintiff's HIV-positive status with poor prognosis given that Plaintiff had been unable to tolerate some of the medication prescribed for Plaintiff's HIV condition, Dr. Gutierrez Deposition T. at 29, 35, or Dr. Clemens's assertion that, based on conversations with the infectious disease specialist following Plaintiff's HIV condition, Dr. Clemens believed "hormonal therapy could be detrimental to the management of [Plaintiff's] other [health] problems." Dr. Clemens Declaration ¶ 8. These uncontroverted averments contradict Plaintiff's claim that Defendants' failure to treat Plaintiff's GID manifested deliberate indifference to Plaintiff's serious medical condition. Plaintiff presents no evidence to rebut Dr. Gutierrez and Dr. Clemens's statements describing their medically-based reasons for denying Plaintiff's hormone therapy requests.

Accordingly, Plaintiff has failed to establish any disputed fact which, if decided in Plaintiff's favor, would survive summary judgment on the subjective component of Plaintiff's Eighth Amendment deliberate indifference claim. Plaintiff's motion for summary judgment on the issue of liability on the Eighth Amendment deliberate indifference claims is thus DENIED, and summary judgment is GRANTED in favor of Defendants on this element of Plaintiff's claim.

---

[18] Although Dr. Mazur also commented that nothing within Plaintiff's medical documentation supports such claims, Plaintiff does not assert that she was denied care for the May 2007 incident.

**B.     Retaliation**

Plaintiff alleges that immediately after commencing the instant action, she was transferred from a single occupancy cell, which Plaintiff had occupied for three years, to a double occupancy cell with a male roommate, which was "extremely distressing" to Plaintiff, and that Defendants denied Plaintiff's repeated requests to be transferred back to a single occupancy cell.  Amended Complaint ¶¶ 29-35.  According to Plaintiff, the transfer was intended to impose cruel and unusual punishment on Plaintiff in retaliation for filing Plaintiff's action.  *Id*. ¶ 36.  Although Plaintiff's right to petition for redress of grievances arises under the First Amendment, Plaintiff references the Eighth Amendment as the constitutional source of her retaliation claim.  *See* Plaintiff's Memorandum at 1 (asserting Defendants "retaliated against her [Plaintiff] for commencing this lawsuit by transferring her from a single cell to a double occupancy cell, despite her illness, in violation of her rights under the Eighth Amendment . . . .").  Regardless, because the court's research reveals no authority to support a retaliation claim brought solely under the Eighth Amendment, Plaintiff's retaliation claim is analyzed under the First Amendment.

"Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act."  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotations omitted).  The elements of a § 1983 First Amendment retaliation claim include "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3)

that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

Here, with regard to the first element, it is well-established that Plaintiff's commencement of legal action constitutes speech protected under the First Amendment, *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006) (stating in context of § 1983 First Amendment retaliation claim, "complaints, protests, and lawsuits are protected speech"). As to the second element, the court assumes, for the purposes of the pending motions, that Plaintiff's transfer to a double occupancy room with a male roommate constituted an adverse action because it is not implausible that such official conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" as required. *Davis*, 320 F.3d at 353 (discussing adverse action requirement of a retaliation claim). There is, however, nothing in the record establishing any causal connection between Plaintiff's commencement of this action, and her transfer to a double occupancy cell where she was housed with a male inmate.

The causation requirement of a retaliation claim is satisfied if the allegations are "sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, (2002)). Here, none of the Defendants are alleged by Plaintiff to have been involved in either requesting or arranging Plaintiff's transfer to the double occupancy cell. As such, Defendants are not alleged to have been personally involved in the claimed retaliatory conduct as required under § 1983. *See Gronowski v. Spencer*, 424

F.3d 285, 293 (2d Cir. 2005) (discussing requirement that defendant be personally involved in alleged adverse action to support § 1983 retaliation claim).  Moreover, the uncontroverted evidence submitted by Defendants negates the possible existence of any causal connection between Plaintiff's commencement of the instant action, and Plaintiff's subsequent transfer to a double occupancy cell with a male roommate.

In particular, in opposition to summary judgment, Dr. Clemens explains that single occupancy rooms in Wende's RMU "are reserved for the most infectious and contagious patients" treated, and that single occupancy rooms "are limited resources that are utilized for appropriate patients."  Dr. Clemens Declaration ¶ 10.  In May 2006, however, it was determined that Plaintiff, at that time, had no medical need for a private room. *Id*.  As such, Plaintiff's request to be transferred back to a single occupancy room was denied.  *Id*.  Plaintiff neither responds to this argument, nor provides any affidavit, or other evidence, countering Dr. Clemens's explanation of the reason for Plaintiff's transfer to a double occupancy room.

As such, Plaintiff has failed to meet both her burden in support of summary judgment on Plaintiff's retaliation claim, as well as in opposing summary judgment in favor of Defendants on the retaliation claim.  Summary judgment is thus DENIED as to Plaintiff, and GRANTED in favor of Defendants on the retaliation claim.

## **CONCLUSION**

Based on the foregoing, Defendants' motion to dismiss (Doc. No. 44), is

DENIED; Plaintiff's motion for partial summary judgment (Doc. No. 48), is DENIED;

summary judgment is GRANTED in favor of Defendants.  The Clerk of the Court is

directed to enter judgment for Defendants and close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 8, 2010
                    Buffalo, New York